UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DANIEL J. DIPERNA,

               **Plaintiff,**

v.                                                              Case No:  6:12-cv-687-Orl-36KRS

GEICO GENERAL INSURANCE
COMPANY,

               **Defendant.**

_____

## ORDER

      This cause comes before the Court on the cross-motions for summary judgment filed by the parties in this matter.  Plaintiff Daniel J. Diperna ("Diperna" or "Plaintiff") filed a Motion for Summary Judgment ("Diperna Motion") (Dkt. 43) and Defendant GEICO General Insurance Company ("GEICO" or "Defendant") filed a Motion for Summary Judgment ("GEICO Motion") (Dkt. 45).  Responses and a reply to the motions for summary judgment were filed (Dkts. 51, 52, 55).  Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, memoranda of counsel and accompanying exhibits, and for the reasons that follow, both motions for summary judgment will be denied.

## I.    BACKGROUND

### A.    Statement of Facts[1]

      This is a Florida common law third-party insurance bad faith action arising out of an automobile accident that occurred on August 4, 2007 between Plaintiff Diperna and Joseph

_____

[1] The Court has determined the facts based on the parties' submissions, including GEICO's activity log, affidavits, and deposition testimony. Disputes concerning the facts are noted.

Umberger ("Umberger").[2]  (GEICO Mot., Ex. B "Police Report").  The accident involved a rear-end collision in which Mr. Umberger struck Diperna's car from behind.  (Police Report; GEICO Mot., Ex. C Diperna Interview ("Diperna Int.") at 5; Diperna Mot., Ex. 2 "GEICO Claims File").  At the time of the accident, Mr. Umberger carried automobile insurance through GEICO under the policy number 4026-30-57-08.  (Diperna Mot., Ex. 1 "Umberger Insurance Policy"; GEICO Mot., Ex. A "Affidavit of Coverage").  This insurance was effective from May 2, 2007 through November 2, 2007 and provided bodily injury coverage in the amount of $10,000.00 per person and $20,000.00 per occurrence.  *Id.*  In addition, the insurance provided property damage coverage in the amount of $10,000.00.  *Id.*

The day after the accident GEICO made notes, including the fact that Mr. Umberger rear-ended Diperna, and also noted that it was commencing its investigation into the accident.  (GEICO Mot., Ex. D "GEICO Activity Log"; GEICO Claims File).  The day after that, on August 6, GEICO assigned Sherry Zuniga ("Zuniga") as the claims representative to handle the claim against Mr. Umberger.  (GEICO Activity Log at 3; Diperna Mot., Ex. 3 Deposition of Sherry Zuniga ("Zuniga Dep.") 19:23-20:6).  Ms. Zuniga had worked for GEICO for approximately eight years at the time of her assignment to the Umberger claim.  (Zuniga Dep. 9:17-19).  Her job was as a TCR-2 claims representative.  *Id.* at 8:25-9:4.  In this position, her responsibility was to handle minor soft tissue injury claims, which means that she typically does not handle claims involving broken bones, unless it involves a minor fracture.  *Id.* at 8:25-9:16.  As a TCR-2 claims representative, she also typically does not handle claims that are in litigation.  *Id.*  If there is more than a soft tissue injury involved in a claim, it would normally be handled by the Continuing Unit at GEICO.  (Gilliece Dep. 20:24-21:11).

---

[2]At the time of the accident, Diperna was a minor.  GEICO Mot., Ex. C ("Diperna Interview") at 2.

On the same day that Ms. Zuniga was assigned to the Umberger claim, she conducted a recorded interview with Diperna regarding the accident and explained the bodily injury claims process to Diperna's mother.  (Diperna Int.; GEICO Activity Log at 4-5; Zuniga Dep. 21:13-23:15).  During this interview, Diperna told Ms. Zuniga that Mr. Umberger rear-ended him, that Diperna experienced neck, back and shoulder pain on the evening of the accident, and that he went to the emergency room for x-rays.  (Diperna Int.).  The next day, Ms. Zuniga sent a letter to Mr. Umberger indicating that, although GEICO would attempt to settle the bodily injury claims against him within his policy limits, those claims might potentially exceed his policy limits, and that he might be personally exposed to any amount in excess of those limits.  (GEICO Mot., Ex. E August 7, 2007 Umberger Letter ("Aug. 7 Umberger Letter"); GEICO Activity Log at 5).  In that letter, Ms. Zuniga also requested that Mr. Umberger inform GEICO as to whether he had additional bodily injury coverage, informed him that he had a right to retain his own attorney, and assured him that GEICO would contact him if they were unable to settle the claims against him.  *Id.*  According to GEICO's activity log, Mr. Umberger called Ms. Zuniga regarding this letter on August 11 and she explained to him that his coverage was not sufficient to cover the potential liability to which he was exposed regarding the August 4 accident.  (GEICO Activity Log at 8).[3]

Mr. Nicholas Panagakis, Esq. sent letters of representation to Ms. Zuniga and GEICO on August 16 and 17, respectively, informing them that Diperna was now being represented by him with respect to the car accident.  (GEICO Mot., Ex. F "Letters of Representation"; Zuniga Dep. 30:9-25 and Exs. 3 & 4).  Meanwhile, on August 18, GEICO received a copy of the police report

---

[3] Mr. Umberger has testified that GEICO would not speak with him regarding the claim and that he did not receive many of the letters GEICO avers were sent to him.  Dkt. 45, Ex. Q, 13:6-11; 28:6-29:3, 30:17-31:17; 36:9-16, 41:2-43:3.

of the incident, which indicated that Mr. Umberger had been issued a citation for failure to use due care resulting from the accident, and that there were no injuries.  (Police Report, GEICO Activity Log at 9; Zuniga Dep. 32:5-34:14).  On August 24, before GEICO received the Letters of Representation, Ms. Zuniga called Diperna and his mother informed Ms. Zuniga that she had retained an attorney for Diperna.  (GEICO Activity Log at 9; Zuniga Dep. 35:4-15).  Ms. Zuniga, in turn, called Mr. Umberger that same day to inform him of this information.[4]  (GEICO Activity Log at 9; Zuniga Dep. 35:16-21).

Ms. Zuniga finally received the August 16 letter from Mr. Panagakis on September 2. (GEICO Activity Log at 9; Zuniga Dep. 36:4-11).  The letter requested insurance policy disclosures pursuant to Section 627.4137 of the Florida Statutes.  (Letters of Representation, GEICO Activity Log at 9).  Ms. Zuniga acknowledged receipt of Mr. Panagakis' letter and requested additional information from him, including medical records, in order to continue evaluating Diperna's claim, and copied Mr. Umberger on the letter.[5]  (GEICO Mot., Ex. G September 2, 2007 "Letter of Acknowledgment").  On September 4, Ms. Zuniga sent another letter to Mr. Panagakis, also dated September 2, requesting that Diperna sign and return the enclosed medical and wage authorization so that GEICO could obtain the documentation necessary to support Diperna's claim.  (GEICO Mot., Ex. H, September 4, 2007 "Sept. 4 Panagakis Letter").  Mr. Umberger was not copied on this letter.  *Id.*  On September 18, GEICO faxed an "Affidavit of Coverage" to Mr. Panagakis informing him about Mr. Umberger's available coverage limits and indicating that Mr. Umberger had no known additional insurance coverage.  (Affidavit of Coverage; GEICO Activity Log at 10).

---

[4] *See* n. 3 regarding Mr. Umberger's denial that Ms. Zuniga communicated with him.
[5] *See* n. 3 regarding Mr. Umberger's denial that Ms. Zuniga communicated with him.

On September 22, Ms. Zuniga again called and left a message for Mr. Panagakis inquiring about the diagnosis regarding Diperna's injury. (GEICO Activity Log at 10). Ms. Zuniga also called and left a message for Mr. Umberger informing him that GEICO had no new updates regarding Diperna's injury.[6] *Id.* The next day, Ms. Zuniga mailed Mr. Panagakis a certified copy of Umberger's insurance policy. (GEICO Mot., Ex. I September 23, 2007 Panagakis Letter "Sept. 23 Panagakis Letter"; GEICO Activity Log at 10).

On October 29, Mr. Panagakis informed Ms. Zuniga that Diperna had suffered a fractured neck bone as a result of the car accident. (GEICO Activity Log at 11; Zuniga Dep. 42:20-43:1). Ms. Zuniga requested a fax confirmation of the fracture. (GEICO Activity Log at 11). Mr. Panagakis told Ms. Zuniga that he would obtain the medical records confirming the fracture and fax it to her as requested. *Id.* Ms. Zuniga left messages for Mr. Panagakis numerous times in November and December 2007 in order to obtain an update regarding Diperna's treatment status, including medical records confirming his neck bone fracture, to no avail. *Id.* Meanwhile, on November 26, Ms. Zuniga's supervisor, Robin Gilliece ("Gilliece"), evaluated Diperna's ninety-day review report, which had been completed and submitted by Ms. Zuniga. *Id.*; Zuniga Dep. 44:1-45:9. After reviewing the file, Ms. Gilliece indicated that the claim should be a quick closure, but that they still needed confirmation of Diperna's fractured neck bone and that Mr. Umberger should be made aware of the possibility of such injury. (Diperna Mot., Ex. 5 Deposition of Robin Gilliece ("Gilliece Dep.") 31:1-32:22; Zuniga Dep. 44:2-45:9). On December 13, Ms. Zuniga updated Mr. Umberger regarding the status of his claim, and told him

---

[6] *See* n. 3 regarding Mr. Umberger's denial that Ms. Zuniga communicated with him.

that Diperna's attorney had not yet provided additional medical information regarding Diperna's injury.[7]  (GEICO Activity Log at 12).

On December 17, GEICO received a demand letter, dated December 12, from Mr. Panagakis, offering to settle Diperna's claim.  (GEICO Activity Log at 12; Zuniga Dep. 46:14-47:16; 48:2-8; Gilliece Dep. 32:23-33:4; Diperna Mot., Ex. 6 and GEICO Mot., Ex. J December 12, 2007 Demand Letter ("Demand Letter")).  The demand was for the payment of Mr. Umberger's $10,000.00 bodily injury policy limit.  (Demand Letter; Zuniga Dep. 448:16-18).  The settlement offer contained a number of conditions:  1) a mutual release; 2) a financial affidavit executed by Mr. Umberger (the affidavit to be completed by Mr. Umberger was enclosed with the letter); and 3) an executed affidavit indicating that no other insurance covered the damage.  (Demand Letter; Zuniga Dep. 48:9-49:8; Gilliece Dep. 35:4-22).  The letter also indicated that GEICO had twenty-one days from the date of the letter to provide Mr. Panagakis' office with an answer regarding whether they agreed to settle the matter, and that, following this twenty-one day deadline, the offer to settle would be withdrawn and a lawsuit would be filed to seek an excess judgment against Mr. Umberger.  (Demand Letter).

On December 19, GEICO confirmed that Diperna had suffered an avulsion fracture.  (GEICO Activity Log at 12).  Based on this confirmation, GEICO gave immediate authorization to tender the full $10,000.00 bodily injury policy limit to Mr. Panagakis for Diperna.  (GEICO Activity Log at 12; Zuniga Dep. 56:4-25).  Ms. Zuniga called Mr. Panagakis' office to inform him that GEICO intended to tender Mr. Umberger's bodily injury policy limit.  (GEICO Activity Log at 12).  Ms. Zuniga also spoke with Mr. Umberger on that day, informing him about the Demand Letter, the purpose of the financial affidavit requested, and the requirement that the

_____

[7] *See* n. 3 regarding Mr. Umberger's denial that Ms. Zuniga communicated with him.

affidavit be completed and returned to Mr. Panagakis by January 1, 2008.  *Id.*[8]  Mr. Umberger

agreed to complete the financial affidavit and send it to Mr. Panagakis.  (GEICO Activity Log at

12; Zuniga Dep. 56:4-15).[9]   Ms. Zuniga updated Mr. Umberger's address and mailed the

financial affidavit to him that same day.[10]  (GEICO Activity Log at 12-13).

On December 20, Ms. Zuniga sent a proposed release to Mr. Panagakis, inviting him to

make suggestions to modify it, but he never responded.   (Zuniga Dep. 60:19-61:13; GEICO

Mot., Ex. K December 20, 2007 Panagakis Letter ("Dec. 20 Panagakis Letter")).   In this letter,

Ms. Zuniga also informed Mr. Panagakis that the settlement check was being sent under separate

cover, but she did not tell him that she asked Mr. Umberger to send a completed financial

affidavit directly to him.  (Dec. 20 Panagakis Letter; Zuniga Dep. 60:19-61:13).   On December

27, Ms. Zuniga followed up with Mr. Umberger regarding the financial affidavit he was to

complete and return to Mr. Panagakis, and Mr. Umberger informed her that he mailed the

financial affidavit to Mr. Panagakis the same day he received it.[11]  (GEICO Activity Log at 13).

Mr. Panagakis testified that he never received any financial affidavit from Mr. Umberger

or received a request for an extension of time to provide such affidavit from GEICO.  (Diperna

Mot., Ex. 7 Deposition of Nicholas Panagakis, Esq. ("Panagakis Dep.") 46:17-48:8).   Mr.

Panagakis also testified that he never received an executed affidavit from GEICO stating that Mr.

Umberger had no other insurance that could cover the potential loss.  (Panagakis Dep. 48:11-49-

17).  No one from GEICO, including Ms. Zuniga, followed up with Mr. Panagakis regarding the

---

[8] *See* n. 3 regarding Mr. Umberger's denial that Ms. Zuniga communicated with him.

[9] *See* n. 3 regarding Mr. Umberger's denial that Ms. Zuniga communicated with him.

[10] Mr. Umberger denies that this communication with Ms. Zuniga occurred and also denies that he ever received any financial affidavit.  Dkt. 45, Ex. Q, 53:24-54:1, 18-55:6, 58:2-6; 59:13-60:6, 60:22-61:9.

[11] Mr. Umberger denies that this communication with Ms. Zuniga occurred and also denies that he ever told her that he completed and sent the financial affidavit to Mr. Panagakis.  Dkt. 45, Ex. Q, 58:4-23, 61:14-63:13, 65:7-66:17.

status of the proposed release or the financial affidavit GEICO believed Mr. Umberger had already mailed in.  (Zuniga Dep. 69:8-70:17-23).  Ms. Gilliece testified that she would have wanted Ms. Zuniga to follow up with respect to the status of the release.  (Gilliece Dep. 46:17-47:5).

It was not until June 4, 2008 that GEICO discovered that the settlement check that it sent to Mr. Panagakis had not been cashed.  (GEICO Activity Log at 14; Zuniga Dep. 71:19-72:17).  This prompted GEICO to reopen the Diperna claim file on June 13, reassign it to Ms. Zuniga, and to have another check issued.  (GEICO Activity Log at 14; Zuniga Dep. 72:23-73:20).  On June 16, GEICO stopped payment on the first check and reissued a new settlement check for $10,000.00.  (GEICO Activity Log at 14).  On December 5, GEICO stopped payment on the second check after it was informed by Mr. Panagakis' office that the case had gone into litigation.  (GEICO Activity Log at 15; Zuniga Dep. 74:4-18).  No one at GEICO informed Mr. Umberger of this information.  (Gilliece Dep. 51:19-53:7; Zuniga Dep. 74:14-75:16).

The lawsuit was actually filed on February 2, 2009.  (GEICO Mot., Ex. L "Diperna State Complaint").  Again, no one at GEICO informed Mr. Umberger of this fact.  (Gilliece Dep. 51:19-53:7; Zuniga Dep. 74:14-75:16).  Ms. Gilliece testified that she would have wanted someone to inform Mr. Umberger that the case had entered litigation.  (Gilliece Dep. 52:7-10).  On April 30, GEICO received a copy of a Motion for Default that had been entered against Mr. Umberger in the underlying action.  (GEICO Activity Log at 15).  On the same day, GEICO referred the case to Scott Turner, Esq., and the Umberger claim was reassigned to another claims representative.  *Id.* On May 1, Mr. Turner sent Mr. Umberger a letter generally stating that "[a]n insurance company has selected a lawyer to defend a lawsuit or claim against you," and noted that the letter concerned "Diperna v. Umberger" with respect to Claim number

0269310030101012, and that the date of the loss was August 4, 2007.  (Dkt. 52 "GEICO Response", Ex. A, "Turner Letter").

In addition, GEICO attempted to contact Mr. Umberger to inform him of the action that was filed against him, but the number listed was noted as unavailable when dialed.  (GEICO Activity Log at 16).  On May 4, 2008, GEICO sent Mr. Umberger a letter informing him about the action against him in state court and that GEICO had assigned Mr. Turner as the attorney to handle his defense in that suit.  (GEICO Response, Ex. B "May 4 Umberger Letter").  Although not in the record, GEICO claims that this letter was returned unopened because the address it had used for Mr. Umberger was incorrect.  *See* GEICO Response at 18.  Therefore, GEICO sent another letter to Mr. Umberger on May 14, using another address.  GEICO Response, Ex. C "May 14 Umberger Letter."

### B.      Procedural History

On February 28, 2011, Umberger entered into a Consent Judgment with Diperna for $625,000.00 in the state court case.  (GEICO Mot., Ex. M  "Final Judgment".)  On April 3, 2012, Diperna filed a third party insurance bad faith action against GEICO in the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County, Florida.  *See* Dkt. 2.  GEICO removed the action to this Court on May 4, 2013.  *See* Dkt. 1.  The instant cross-motions for summary judgment followed.

## II.      STANDARD OF REVIEW

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]"  Fed. R. Civ. P. 56(c)(2).  Issues of facts are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A fact is "material" if it may affect the outcome of the suit under governing law.  *Id*.  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party.  *Shotz v. City of Plantation, Fla*., 344 F.3d 1161, 1164 (11th Cir. 2003).

## III.   DISCUSSION

### A.     Florida Bad Faith Law

Under Florida law, an insurer has a duty of good faith towards its insured in its handling of claims brought against the insured.  *See Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 672 (Fla. 2004).  Specifically, the insurer "has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980) (citations omitted). This is because "the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement . . . ." *Id.* Therefore, "the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured." *Id.*  Thus, "[t]he focus in a bad faith case is not on the actions of the claimant but . . . on those of the insurer in fulfilling its obligations to the insured." *Berges*, 896 So. 2d at 677.  The insurer has a fiduciary duty to act in the insured's best interests. *Id.*

Specifically, an insurer's good faith duty obligates it to: 1) investigate the facts of the claim, 2) give fair consideration to a settlement offer that was not unreasonable under the facts, 3) advise its insured of settlement opportunities, 4) settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so, 5) advise its insured of the probable outcome of litigation, 6) warn its insured of the possibility of an excess judgment, and 7) advise its insured of any steps he might take to avoid an excess judgment. *Boston Old Colony*, 386 So. 2d at 785.

"Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith." *Id.* However, "bad faith is a distinct standard to that of negligence." *Novoa v. GEICO Indemnity Co.*, No. 12-80223-CV, 2013 WL 172913, *4 (S.D. Fla. Jan. 16, 2013) *aff'd*, No. 13-10704, 2013 WL 5614269 (11th Cir. Oct. 15, 2013) (citation omitted). "Unlike ordinary negligence, '[t]he essence of an insurance bad faith claim is that the insurer acted in its own best interests [and] failed to properly and promptly defend the claim, . . . thereby expos[ing] the insured to an excess judgment.'" *Novoa*, 2013 WL 172913 at *4 (quoting *Maldonado v. First Liberty Ins. Corp.*, 546 F. Supp. 2d 1347, 1353 (S.D. Fla. 2008)). Insurers have a positive duty to handle claims in a way that protects the interests of their insured, but they are not required to handle them perfectly. *Novoa*, 2013 WL 172913 at *4.

"[W]hether an insurer has acted in bad faith in handling [an insured's] claim[] is determined under the 'totality of the circumstances' standard." *Berges*, 896 So. 2d at 680. "Each case is determined on its own facts and[,] ordinarily, '[t]he question of [whether an insurer has] fail[ed] to act in good faith with due regard for the interests of the insured is for the jury.'" *Id.* (quoting *Boston Old Colony*, 386 So. 2d at 785); *see also Campbell v. Government*

*Employees Ins. Co.*, 306 So.2d 525, 530-31 (Fla. 1974) ("[R]easonable diligence and ordinary care [are] material in determining bad faith. Traditionally, reasonable diligence and ordinary care are considerations of fact – not of law.").

A breach of the duty of good faith by the insurer "may give rise to a cause of action for bad faith against th[at] insurer." *Perera v. United States Fidelity and Guaranty Co.*, 35 So. 3d 893, 898 (Fla. 2010). "Even though the bad faith occurs between the insurer and its named insured, Florida law allows the injured third party . . . to bring an action directly against the insurer." *Farinas v. Florida Farm Bureau Gen. Ins. Co.*, 850 So. 2d 555, 558 (Fla. 4th Dist. Ct. App. 2003) (citing *Thompson v. Commercial Union Ins. Co.,* 250 So.2d 259, 262 (Fla. 1971)). The rationale for this "is that the injured [third] party, as the beneficiary of any successful bad faith claim, is the real party in interest as a sort of judgment creditor." *Farinas*, 850 So. 2d at 558 (citing *Thompson*, 250 So.2d at 264). Under Florida law, "an insured or a third-party claimant may bring a third-party bad-faith cause of action when an insurer has breached its duty of good faith and that breach results in an excess judgment . . . against the insured."[12] *Perera*, 35 So. 3d at 899. Thus, "if an insurer [i]s found to have acted in bad faith, the insurer . . . ha[s] to pay the entire judgment entered against the insured in favor of the injured third party, including any amount in excess of the insured's policy limits." *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 58 (Fla. 1995). This is called a third-party bad faith common law action. *Id.* A causal connection between the bad faith conduct and the damages assessed against the insured is required. *Perera*, 35 So. 3d at 901, 902. In a third-party bad faith action, the judgment entered

---

[12] An excess judgment is the difference between all insurance coverage available to the insured and the amount of the verdict recovered by the injured party. *See Perera*, 35 So. 3d at 902 (citations omitted).

against the insured in excess of the insured's policy limits must have been caused by the bad faith conduct of the insurer.  *Id.*

### B.    Analysis

The issue in both motions is whether GEICO breached its duty of good faith to its insured, Mr. Umberger, and thus acted in bad faith in the handling of Mr. Umberger's insurance claim.  Diperna contends that there is no genuine issue of material fact regarding this issue and that he is entitled to judgment as a matter of law because GEICO breached its duty. Similarly, GEICO contends that there is no genuine issue of material fact regarding this issue and that it is entitled to judgment as a matter of law because it did not breach its duty. Specifically, Diperna argues that GEICO breached its duty of good faith to Mr. Umberger as a matter of law when it abdicated to Mr. Umberger the responsibility of complying with one of the conditions of the settlement offer, failed to follow up with Diperna's attorney to ensure he had received and approved of GEICO's proposed release, and failed to inform Mr. Umberger that Diperna's claim against him had entered into litigation.  Diperna Mot. at 5-6.  GEICO argues that it did not act in bad faith in handling Mr. Umberger's claim as a matter of law because the evidence shows that GEICO diligently attempted to settle Diperna's claim against Mr. Umberger and at no time placed its own interest ahead of Mr. Umberger's.  GEICO Mot. at 16.  GEICO also argues that it never had a realistic opportunity to settle the claims against Mr. Umberger in any event.  *Id.* at 20.

The parties do not assert a dispute regarding whether GEICO fulfilled its good faith duty obligations to 1) investigate the facts of the Diperna claim or 2) give fair consideration to Diperna's settlement offer.  Rather, the arguments of the parties and the evidence raise issues with respect to whether GEICO 1) appropriately advised Mr. Umberger of Diperna's settlement offer, 4) could have settled the claim, where a reasonably prudent person, faced with the prospect

of paying the total recovery, would have done so, 5) advised Mr. Umberger of the probable outcome of litigation, 6) warned Mr. Umberger of the possibility of an excess judgment, and 7) advised Mr. Umberger of any steps he might take to avoid an excess judgment.

1.      *The Diperna Settlement Offer*

GEICO received a demand letter from Mr. Panagakis on December 17, 2007 offering to settle Diperna's claim against Mr. Umberger for his bodily injury policy limit of $10,000.00. In order for GEICO to accept the offer, Mr. Panagakis indicated, in bold type, that the settlement offer was conditioned on: 1) Mr. Panagakis' office and GEICO agreeing on language for a mutual release; 2) Mr. Umberger having completed and executed the financial affidavit enclosed with the Demand Letter; and 3) an executed affidavit indicating that Mr. Umberger had no other insurance that covered the claim. The letter also indicated, in bold and underlined type, that Mr. Panagakis' office must receive an answer from GEICO regarding Mr. Panagakis' settlement offer within twenty-one days of December 12, 2007, the date of the Demand Letter. Therefore, the deadline to respond was January 1, 2008. The Demand Letter further indicated that after that deadline, the settlement offer would be withdrawn and a lawsuit would be filed to seek an excess judgment against Mr. Umberger.

Diperna submits that GEICO acted in bad faith as a matter of law with respect to two of the Demand Letter's three conditions. First, Diperna contends that GEICO breached its duty of good faith to Mr. Umberger when it relinquished to him the responsibility of ensuring that the financial affidavit was executed and returned to Mr. Panagakis. It is undisputed that Mr. Panagakis never received a financial affidavit, which was completed and executed by Mr. Umberger. Additionally, the record reflects that GEICO did not follow up with Mr. Panagakis to ensure that he received the affidavit from Mr. Umberger. Moreover, there is no evidence in the record that Ms. Zuniga ever informed Mr. Panagakis that she asked Mr. Umberger to return a

completed and executed financial affidavit directly to him. Instead, Ms. Zuniga testified that she called Mr. Umberger and informed him about the financial affidavit and that he was to complete and return it directly to Mr. Panagakis by January 1, 2008 and that he agreed to do this. However, Mr. Umberger denies having a conversation with Ms. Zuniga in which he agreed to complete the financial affidavit and mail it to Mr. Panagakis.  Mr. Umberger testified that GEICO would not speak with him regarding his Diperna claim.  Ms. Zuniga also testified that she followed up with Mr. Umberger on December 27, 2007 regarding the financial affidavit and that he informed her that he had already mailed the affidavit to Mr. Panagakis the same day that he received it from her.  Mr. Umberger denies having this conversation with Ms. Zuniga.  Mr. Umberger also denies receiving the financial affidavit from Ms. Zuniga. A genuine issue of material fact exists as to whether GEICO appropriately advised Mr. Umberger of Diperna's settlement offer.

Second, Diperna argues that GEICO breached its duty of good faith to Mr. Umberger because it failed to follow up with Diperna's attorney to ensure he had received and approved the proposed release GEICO sent him.  Diperna Mot. at 5-6, 9.  In addition, Diperna argues, no one informed Mr. Umberger that GEICO had failed to fulfill one of the settlement conditions by not securing a mutual release.  *Id.* at 9.  The record reflects that once GEICO received confirmation that Diperna had indeed suffered a neck bone fracture, it gave immediate authorization to tender Mr. Umberger's bodily injury policy limit of $10,000.00 to Diperna in satisfaction of Mr. Panagakis' settlement demand. Within two days of receiving the Demand Letter, Ms. Zuniga sent Mr. Panagakis a proposed release and informed him that a settlement check would be sent under separate cover.  GEICO believed that the Affidavit of Coverage that it had previously faxed to Mr. Panagakis on September 18, 2007 indicating that Mr. Umberger had no other

known coverage satisfied that condition of the settlement offer.  *See* Zuniga Dep. 40:23-25, 41:1-8, 42:9-25; Panagakis Dep. 42:9-25; GEICO Activity Log at 10.

It is clear from the record that Ms. Zuniga never followed up with Mr. Panagakis to ensure that he received the proposed release that she sent to him. Yet Ms. Gilliece, Ms. Zuniga's supervisor, testified that she would have wanted Ms. Zuniga to do so.  Further, there is no evidence in the record to suggest that Ms. Zuniga ensured that Mr. Panagakis received the Affidavit of Coverage or that she informed him that she intended the Affidavit of Coverage to satisfy the condition in the settlement offer related to whether Mr. Umberger had additional coverage.  Such failure to follow up raises the issue of whether GEICO could reasonably have settled the claim if it had merely followed up with Mr. Panagakis and whether this was something that a reasonably prudent person, faced with the prospect of paying the total recovery, would have done.  In *Berges v. Infinity Ins. Co.,* 896 So.2d 665 (Fla. 2004), the court concluded that there was sufficient evidence, under the totality of the circumstances standard, to support a jury verdict that the insurer breached its duty of good faith to its insured.  896 So. 2d at 682.  The court found that instead of doing everything reasonably possible to complete the settlement, the insurer, amongst other things, failed to follow up or request an extension of time limits from the claimant after it had determined those limits were difficult to meet.  *Id.* at 681.  Rather, the insured simply allowed the deadline to expire without any communication to the claimant.  *Id.* Here, as in *Berges*, a jury could determine that Ms. Zuniga's failure to follow up with Mr. Panagakis regarding the settlement conditions, was a breach of GEICO's duty of good faith toward Mr. Umberger.

Diperna also argues that the fact that GEICO did not re-assign Mr. Umberger's claim to the Continuing Unit, which handles injuries involving bone fractures, is evidence that it was

placing its own interests above Mr. Umberger's in that Ms. Zuniga presumably was paid less than someone who had the experience to handle bone fracture claims.   Diperna Mot. at 9. GEICO, however, counters that once it decides to tender an insured's policy limits, a TCR-2 claims representative may handle a claim involving more than a soft tissue injury.   GEICO Response at 9, citing Zuniga Dep. 16:4-6, 19-25, 17:1-5, 43:12-14, 16-18, 46:6-7; Gilliece Dep. 21:2-11.   Whether the fact that Ms. Zuniga gave Mr. Umberger, as GEICO's insured, the responsibility to fulfill the financial affidavit condition of the settlement offer, or her failure to notify Mr. Panagakis to expect the affidavit from Mr. Umberger, or her failure to follow up with Mr. Panagakis with respect to both the affidavit and the proposed release were beyond her responsibilities as a soft tissue injury claims representative is unclear.   There is no evidence in the record to suggest that those tasks were typical of a bone fracture claims representative and not of a soft tissue claims representative.   Even if those tasks were within her responsibilities as a soft tissue claims representative, as noted above, whether her conduct and inaction rose to the level of bad faith is a jury question.

In its Motion for Summary Judgment, GEICO argues that Diperna's settlement offer did not present a realistic opportunity to settle and, in fact, represented an unwillingness to settle. GEICO Mot. at 20; GEICO Response at 10; *DeLaune, Snowden v. Mutual Casualty Co.*, 358 F. Supp. 2d 1125, 1129 (N.D. Fla. 2003) ("The unwillingness to settle will become a factor only in the unlikely case where the insurer is able to conclusively prove the unwillingness to settle for the policy limits.").   This argument is not supported by the record.   Specifically, GEICO argues that it never heard back from Mr. Panagakis regarding the proposed release GEICO sent to him. It is unclear how that circumstance, in and of itself, represents an "unwillingness to settle,"

especially when GEICO never followed up with Mr. Panagakis at any point to discuss the status of the proposed release.

Furthermore, GEICO argues that the fact that Mr. Panagakis testified that the claim failed to settle because he never received the financial affidavit is moot, since Mr. Umberger testified that he would never have completed and returned the financial affidavit. *See* Umberger Dep. at 67:23-69:7, 70:16-25, 85:12-17; Panagakis Dep. 38:25-39:1, 46:8-16, 51:4-20. Mr. Umberger's testimony regarding the financial affidavit does not evidence an unwillingess to settle or a failure of Mr. Panagakis to present to GEICO a realistic opportunity to settle. There is no evidence that GEICO expressed any concerns regarding the financial affidavit at the time that it was attempting to comply with the settlement conditions. Moreover, Mr. Umberger's testimony that he would have never completed the financial affidavit conflicts with GEICO's evidence that Mr. Umberger told Ms. Zuniga that he had already completed and sent to Mr. Panagakis the affidavit when Ms. Zuniga followed up with him on December 27, 2007. The evidence is in dispute as to whether GEICO explained to Mr. Umberger the purpose of the financial affidavit and the need to complete it in order to settle the Diperna claim.

GEICO further contends that Diperna did not present it with a realistic opportunity to settle because it could not force Mr. Umberger to complete and return the financial affidavit to Mr. Panagakis. However, the focus in a bad faith action is not on the insured's or the third-party's actions, but on the insurer's actions. Specifically, the question here is whether GEICO's conduct regarding the settlement offer amounted to bad faith – whether giving Mr. Umberger the responsibility of returning the financial affidavit directly to Mr. Panagakis and then not following up with Mr. Panagakis to determine whether he had received it was acting with "due regard for the interests of [its] insured."

Here, GEICO has presented no evidence that Diperna was unwilling to settle the claim. Moreover, GEICO has failed to establish that Diperna did not present GEICO with a reasonable opportunity to settle simply because the financial affidavit was one of the conditions of settlement and it had to be completed by Mr. Umberger.  As previously noted, whether Mr. Umberger had any concerns with completing the financial affidavit at all is in conflict and, therefore, a fact question.  Further, Mr. Panagakis testified that there were a number of factors contributing to the failure of the Diperna claim to settle: Mr. Panagakis never received the financial affidavit, or confirmation that Mr. Umberger had no additional insurance coverage, or information regarding whether Mr. Umberger was acting in the course and scope of his employment during the accident. Panagkis Dep. 51:4-20.  Nevertheless, the focus is not on the fact that the settlement offer failed, but whether GEICO acted in good faith with respect to that offer.  *See Berges*, 896 So. 2d at 680 ("Where material issues of fact which would support a jury finding of bad faith remain in dispute, summary judgment is improper.").

2.    *The Umberger Litigation*

Diperna argues that GEICO also acted in bad faith when it failed to even attempt to inform Mr. Umberger that his claim had gone into litigation until May 1, 2009, despite the fact that GEICO was informed by Mr. Panagakis' office on December 5, 2008 that the case had gone into litigation, and such failure to inform occurred even after the case was actually filed on February 2, 2009.  Diperna Mot. at 9.  GEICO's combined conduct, Diperna contends, resulted in Mr. Umberger's state court judgment in the amount of $625,000, when GEICO could have settled his claim for his policy limit of $10,000.00 for bodily injuries when it had the opportunity to do so.

Ms. Zuniga failed to follow up with Mr. Panagakis with respect to his settlement offer at all.  Nevertheless, GEICO subsequently closed the Umberger file and did not become aware that

the settlement check Ms. Zuniga sent to Mr. Panagakis had not been cashed until June 4, 2008, six months after the deadline to respond to the Demand Letter had expired.  In response to this discovery, GEICO reopened the Umberger file, reassigned it to Ms. Zuniga, and merely reissued another $10,000.00 settlement check to Mr. Panagakis.  There is no evidence in the record that Ms. Zuniga or anyone else at GEICO made any contact with Mr. Panagakis at this time, other than to send him another settlement check, in order to ascertain why the first settlement check had not been cashed or to ensure that the settlement offer was still on the table.  Another six months passed and, within that time, Ms. Zuniga and GEICO again failed to determine whether the second settlement check was cashed.  Almost a year after the deadline for the settlement offer had expired, Mr. Panagakis' office informed GEICO that Diperna's claim against Mr. Umberger had gone into litigation.  It was this notification that enabled GEICO to discover that the second settlement check had also not been cashed.

GEICO's explanation as to why no one informed Mr. Umberger that his claim had gone into litigation after Mr. Panagakis' office notified GEICO of this in December 2008 was that it found no evidence of any state court case that had been filed against Mr. Umberger.  GEICO Response at 17.  In actuality, the case was not filed until February 2009 and GEICO claims that it did not receive a courtesy copy of the complaint.  *Id.*  Not until April 2009 did GEICO discover that the case had indeed entered litigation when it received a copy of a Motion for Default in that action.  *Id.*  Immediately, GEICO assigned an attorney to defend Mr. Umberger in that action and that attorney sent Mr. Umberger a letter on May 1, 2009.

After receiving the December 5, 2008 call from Mr. Panagakis' office and subsequently discovering that the case had not yet gone into litigation, GEICO failed to do anything with this claim.  It had already canceled the second settlement check upon learning that it had not been

cashed.  At this point, GEICO knew that the claim against Mr. Umberger was not settled.  Yet GEICO still failed to inform Mr. Umberger of the status of his claim and did not make any further communication with Mr. Panagakis to inquire about his plans to enter the claim into litigation or whether there was any possibility that the claim could still be settled.  In fact, GEICO had not communicated with Mr. Umberger regarding the status of his claim since December 27, 2007, when Ms. Zuniga states that she followed up with him about the financial affidavit, seventeen months before the letter from Mr. Turner to Mr. Umberger.  Ms. Gilliece testified that she would have wanted someone to at least inform Mr. Umberger that the case had entered litigation in February 2009.

GEICO's failure to inform Mr. Umberger that the claim had gone into litigation, as well as the conflict in the record regarding whether Ms. Zuniga sufficiently communicated with Mr. Umberger regarding the settlement offer, is related to the question of whether GEICO 1) advised Mr. Umberger of the probable outcome of litigation, 2) warned Mr. Umberger of the possibility of an excess judgment, and 3) advised Mr. Umberger of any steps he might take to avoid an excess judgment.  All of these circumstances, taken together, under the "totality of the circumstances" standard, sufficiently raise a jury question as to whether GEICO acted in bad faith with respect to its insured, Mr. Umberger.

## IV.    CONCLUSION

For the aforementioned reasons, the Court will deny both Plaintiff's and Defendant's Motions for Summary Judgment, as genuine issues of material fact exist for determination by a jury and neither party is entitled to judgment in their favor as a matter of law.

Accordingly, it is hereby **ORDERED:**

1.      Plaintiff Daniel J. Diperna's Motion for Summary Judgment (Dkt. 43) is **DENIED**.

2.      Defendant GEICO General Insurance Company's Motion for Summary Judgment

(Dkt. 45) is **DENIED**.

3.      A Final Pretrial Conference has been scheduled in this matter for November 21,

2013 at 10:30 a.m.

**DONE** and **ORDERED** in Orlando, Florida on November 15, 2013.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties